JEREMY M. DELICINO
Nevada Bar No. 9331
10 West Broadway, Suite 650
Salt Lake City, Utah 84101
(801) 364-6474 (Voice)
(801) 364-5014 (Fax)
Attorney for Defendant,
Antoine Mouton

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | 3:12-CR-00049-RCJ-VPC |
| Plaintiff, | |
| vs. | DEFENDANT'S SENTENCING MEMORANDUM |
| ANTOINE MOUTON, | |
| Defendant. | |

"Must you have battle in your heart forever?  The bloody toil of combat?  Old contender, will you not yield to the immortal gods?"  Homer, The Odyssey, Book 12.[1]

"The past isn't dead.  It isn't even past."  William Faulkner

It would be comforting to believe that all of us—defendants, lawyers, and judges alike—can overcome the travails of our past and that through sheer determination and fortitude we can undo what's been done.  Indeed, there is something reassuring and perhaps even very American in the belief that any one of us can overcome all obstacles—no matter how high or how daunting—to succeed.   Where a person's past is comprised of outright abandonment rather than just unfortunate hardship, however, the notion that one is simply able to jettison the tragic upbringing that shaped that person may reflect more optimism than reality.  Faulkner's clever aphorism merely highlights what we all know, namely that we live with our past every day.

---

[1] Other versions of The Odyssey have translated the passage as follows: "Must you carry the bloody horror of war in your heart forever?"

There is little doubt that Antoine Mouton's early years were tragic, years in which he was effectively abandoned by his drug addled mother and his imprisoned father and subjected to countless unfathomable horrors.  As a young child, Antoine was cast aside, left to look for food and comfort by himself while his mother looked for drugs.  At an age when most children are learning basic arithmetic, Antoine would count the days until his mother would return home, never sure when or if she would come back.  Instead of having adults around him instill virtue, Antoine was surrounded by unrelenting vice.

It would be easy to say that the choices Antoine has made since those days were his own, that he alone is responsible for the poor decisions in the years to follow. The sad and stark reality, however, is that the horrors of his past are still with him, leading him astray in the same way that an exemplary parent might guide others.  To what extent, then, is he fully accountable for all of his transgressions?  And to what extent should those surrounding him in those fateful years shoulder or share the blame?  Antoine Mouton comes to this Court for sentencing as he has lived most of his life—alone but fighting for one more chance to leave his past behind.  He seeks to forge a new life, one free from the ravages of his past and his wayward ways.  He asks this Court to impose a sentence at the low end of the Guidelines.  Such a request is warranted under the traditional Guidelines framework as well as under the statutory framework prescribed by 18 U.S.C. § 3553(a), and it appropriately takes into account both Mouton's upbringing and the misdeeds that followed.

BACKGROUND[2]

Antoine Mouton had an inauspicious start, born to a mother addicted to crack cocaine and a father who was sent to federal prison for more than a decade soon after his mother became pregnant.  From the time he was born until he was five years old, Mouton lived almost exclusively with his mother, Valencia Cantrell.  She was frequently gone for long stretches,

---

[2] Some of this background is also noted in the presentence report.  See ¶¶ 50-52.

strung out and looking for her next fix instead of looking after her son. Basically abandoned, Mouton would fend for himself the best he could.

When he was five, Mouton's mother lost custodial rights and he began living with his grandparents, who attempted to provide stability. Despite losing custody, Mouton's mother would come and take Antoine to live with her at whatever apartment or room she was living in at the time. Inevitably, she would disappear for several days, leaving Antoine to take care of himself. During this time, Antoine stayed inside and didn't attend school. Only when he was staying with his grandparents did Antoine go to school. Even when his mother was around, Antoine was surrounded by drug addicts and the predictable plight of addicts, men and women for whom Antoine was effectively was invisible. Indeed, at an early age Antoine was constantly exposed to the criminal milieu, and he and his mother were frequently homeless. In a sense, he both lived on the streets and was raised by the men and women of the streets, a child who witnessed his mother being stabbed and assaulted over drugs in addition to bearing witness to the countless shootings and assaults that took place almost daily in the projects he called home.

Unsurprisingly, after an early childhood of neglect and exposure to the worst of humanity, Antoine began having behavioral problems of his own. With no adult supervision, he found refuge on the streets along with all of the other children similarly abandoned by drug-addled parents. Antoine himself was frequently assaulted by older boys, and on one occasion was lit on fire by a group of older kids, suffering third degree burns all over his scalp. It is against this backdrop—one of extreme neglect, a striking lack of any guidance, and the influences of similarly situated kids—that this Court should measure his subsequent actions. There is no doubt that his difficult upbringing in no way excuses his behavior as an adult, but it certainly contextualizes it. The defendant submits that this Court should consider the defendant's unique background in imposing a sentence that is "sufficient but not greater than necessary." Mindful of this Court's inclination to impose an above Guidelines sentence because of Mouton's criminal past, the defendant nonetheless respectfully asks this Court to consider the mitigating circumstances noted above and instead impose a sentence at the low end of the applicable

Guidelines range.

    I.     MOUTON'S LACK OF GUIDANCE AS A YOUTH IS A MITIGATING FACTOR UNDER THE GUIDELINES FRAMEWORK AS WELL AS ANY STATUTORY ANALYSIS PROVIDED BY § 3553(a) AND JUSTIFIES A SENTENCE AT THE LOW END OF THE GUIDELINES RANGE.

Although the Guidelines note that lack of youthful guidance is not relevant to whether a departure is warranted, numerous circuits have nevertheless held that a downward departure may be appropriate in cases of extreme childhood abuse.  See United States v. Rivera, 192 F.3d 81, 85 (2nd Cir. 1999); United States v. Pullen, 89 F.3d 368, 372 (7th Cir. 1996); United States v. Clark, 8 F.3d 839, 845-46 (D.C. Cir. 1993); United States v. Roe, 976 F.2d 1216, 1218 (9th Cir. 1992); United States v. Vela, 927 F.2d 197, 199 (5th Cir. 1991); United States v. Deigert, 916 F.2d 916, 919 (4th Cir. 1990).  As the court in Rivera observed, "[i]t seems beyond question that abuse suffered during childhood—at some level of severity—can impair a person's mental and emotional conditions.  Rivera, 192 F.3d at 85.  See also Penry v. Lynaugh, 492 U.S. 302, 319 (1989) (evidence about the defendant's background is relevant because of the belief "long held by this society, that the defendants who commit criminal acts that are attributable to a disadvantaged background or to emotional or mental problems may be less culpable than defendants who have no such excuse"); Santosky v. Kramer, 455 U.S. 745, 789 (1982) (Rehnquist, J., dissenting) ("It requires no citation of authority to assert that children who are abused in their youth generally face extraordinary problems developing into responsible, productive citizens.").

Aside from the logical assumption that the impact of childhood abuse affects individuals throughout their lives, the empirical evidence supports this proposition.  See U.S. Dep't of Justice, Office of Juvenile Justice and Delinquency Prevention, Risk and Protective Factors of Child Delinquency (2003) (noting that risk factors for adult criminal behavior include delinquent peer groups, family antisocial behavior, parental psychopathology, hyperactivity, poor parenting, and maltreatment).  Indeed, child abuse and neglect can cause chemical changes in the brain and nervous system.  Studies involving abused and neglected children show that abused individuals

4

are significantly more likely to be arrested as juveniles and adults.  Debra Niehoff, *Ties that Bind: Family Relationships, Biology, and the Law*, 56 DePaul L. Rev. 847 (2007).  Studies also demonstrate that abuse can be in the form of neglect only and "need not involve actual physical injury to do lasting damage to the developing brain."  Id. at 849.  As Niehoff observed:

> [E]xposure to stress early in life—specifically, to inadequate or abusive parenting—changes the emotional circuitry of the brain and neuroendocrine mechanisms underlying allostasis [the inherent flexibility that allows functions such as rate and respiration to increase or decrease to counter potentially destabilizing events] in enduring and often compromising ways.

Id.

In Roe, *supra*, the Ninth Circuit reversed the district court's decision that the circumstances of the defendant's childhood were not extraordinary.  976 F.2d at 1218.  In finding that the district court clearly erred, the court noted that the defendant lived with her drug-addicted mother and the mother's boyfriend, a drug dealer, for much of her youth.  Id.  The court in Roe further observed that:

> Roe lacked any semblance of a stable family environment, and it is doubtful that she received any meaningful guidance from her drug-addicted mother or her mother's abusive boyfriend.

Id.  Ultimately, the court remanded to the district court to determine whether Roe was "entitled to a downward departure based on her extraordinary history of childhood abuse and neglect."  Id. at 1219.[3]

Tragically, the circumstances in this case mirror many of the unfortunate facts of Roe.  As noted above, Mouton's childhood was virtually bereft of "any meaningful guidance."  His mother, who was addicted to crack cocaine, would frequently abandon him for long stretches of time—a boy without food, supervision, or, most tragically, love.  It is difficult to imagine the

---

[3] See also United States v. Hollins, 17 Fed. Appx. 651 (9th Cir. 2001) (finding district court erred in finding defendant's childhood abuse was not extraordinary where defendant "was subjected to extreme verbal and physical abuse at the hand of his mother … in addition to having witnessed his mother engage in prostitution and heroin drug use throughout the course of his childhood"); United States. Walter, 256 F.3d 891 (9th Cir. 2001) (noting that "[t]he combination of brutal beatings by his father, the introduction of drugs and alcohol by his mother, and, most seriously, the sexual abuse he faced at the hands of his cousin, appear to us to be the type of extraordinary circumstances that may justify the consideration of the psychological effects of childhood abuse.").

trauma Antoine endured just as it is difficult to fathom what impact exposure to the omnipresent drug addicts around him had. Unsurprisingly, the mental and emotional scars of such a childhood persist today, and his acute need for treatment was likely evident well before his suicide attempt at age 16. This case is not simply a case in which a defendant is asking for a departure based on the existence of some neglect. Rather, the extreme and persistent neglect—neglect that effectively amounted to child abuse—in his childhood was truly extraordinary and left him emotionally and mentally scarred. The defendant believes that the horrors of his past and the persistent effects of that past on him today warrant a sentence at the low end of the Guidelines range.[4]

DATED this 24th day of April, 2013

By: /s/ Jeremy M. Delicino
_____
JEREMY M. DELICINO
Counsel for Antoine Mouton

---

[4] Again, many courts have varied downward to account for childhood abuse and neglect. See, e.g., United States v. Mapp, 2007 WL 485513 (E.D. Mich. Feb. 9, 2007) (imposing sentence of 30 months where Guidelines range was 84-105 months, in part the result of a variance based on the "defendant's family challenges as a youth" and defendant's argument that he lacked the "requisite love, support, or educational guidance"); United States v. Howe, 2010 WL 1565505 (6th Cir. April, 21, 2010) (recognizing that a district court judge can depart *or* vary downward based on a defendant's traumatic childhood, and that a variance under § 3553(a) is not constrained by a finding of extraordinariness). Notably, the defendant does not seek a downward variance or a downward departure, though such requests may in fact be warranted by the cases cited throughout this memo. Instead, the defendant simply requests that this Court impose a sentence at the low end of the applicable Guidelines range.